UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 3:04-CV-30102-KPN
Pages 1-269

SPIRITUAL TREES d/b/a TREE
SPIRIT and DAVID V. DUNN

vs.

Lamson and Goodnow Manufacturing
COMPANY and J. ROSS ANDERSON, JR.

---

**DEPOSITION OF: DAVID V. DUNN**

---

Taken before Joanne Coyle, Certified Shorthand Reporter, Notary Public, pursuant to the Federal Rules of Civil Procedure, at the offices of Bulkley, Richardson and Gelinas, LLP, 1500 Main Street, Springfield, Massachusetts on APRIL 26, 2005, commencing at 10:05 a.m.

Joanne Coyle
Certified Shorthand Reporter
License No. 106693

**PERLIK and COYLE REPORTING**
Certified Professional Reporters

1331 Main Street
Springfield, MA 01103
Tel. (413) 731-7931     Fax (413) 731-7451

1    Q.    Was there any conversation as part of
2  those initial conversations relating to payment of
3  commissions?
4    A.    Other than that the commissions would
5  start on March first, no.
6    Q.    Did you ever tell Mr. Anderson that if
7  you are hired as an employee, you'd be willing to
8  waive commissions?
9    A.    No.
10   Q.    Did you ever tell Mr. Anderson that if
11 hired as an employee, you'd be willing to defer
12 commissions?
13   A.    No.
14   Q.    Did you ever tell Mr. Anderson after
15 being hired as an employee that you would be
16 willing to defer commissions?
17   A.    Yes.
18   Q.    Let's put a time frame on that and we'll
19 get back to that.  When was that?
20   A.    That was in June, 2000.
21   Q.    Was anyone else present when you had
22 that -- strike that.
23         Was that one or more than one
24 conversation with Mr. Anderson?

**PERLIK and COYLE REPORTING**

1      A.   Multiple conversations.

2      Q.   Was anyone else present during the
3 course of those conversations?

4      A.   No.

5      Q.   What do you recall discussing with
6 Mr. Anderson in that regard?

7      A.   The specific discussion revolved around
8 the fact that Lamson had three invoices from
9 Spiritual Trees in the amount of almost ten
10 thousand dollars and that those invoices were due
11 on June 15th, 2000.

12           Lamson -- Sue Atherton had come to me
13 and told me that the line of credit was completely
14 maxed out and that they were having trouble making
15 vendor payments. I went in to Anderson and said
16 how are we going to do this. Anderson came back
17 to me and said look, he felt that things were
18 working out and that he was very interested in
19 giving me a minority interest in the company and
20 wanted to work out and see how things would go and
21 asked if I would defer the commissions in lieu of
22 receiving ownership interest in Lamson.

23           I expressed a sincere interest in that
24 and told him that I would defer the commissions

1  and then waive the commissions if such an
2  agreement were done, but that I wanted an
3  agreement in writing from him.
4      Q.   Did you ever discuss with Mr. Anderson a
5  willingness to defer commission payments while you
6  were an employee?
7      A.   That was while I was.
8      Q.   Regardless of a stock purchase?
9      A.   No.
10     Q.   Did you ever discuss with any other
11 Lamson and Goodnow employee a willingness to defer
12 commission payments while you were an employee?
13     A.   I had to discuss it with Sue Atherton to
14 tell her that we were not going to pay the
15 commissions and she was made aware of that, I
16 believe confirmed it with Anderson.
17          To the best of my knowledge, she then,
18 at that time, removed the invoices that had been
19 placed in the system.
20     Q.   When you say Ms. Atherton was made aware
21 of that, how was she made aware of it?
22     A.   I believe I told her.
23     Q.   What did you tell her?
24     A.   I believe I told her that we were

1           MR. MAYNARD:  If you would mark
2  this?
3           (Defendant's Deposition Exhibit
            No. 18 offered and marked.)
4
5      Q.   (BY MR. MAYNARD)  Mr. Dunn, you
6  testified this morning to the fact that early in
7  your tenure as an employee you saw to it that
8  commission invoices were prepared.  Do you recall
9  that?
10     A.   That I saw to it that Tree Spirit
11 prepared those?
12     Q.   Yes.
13     A.   Yes.
14     Q.   Let me show you what's been marked as
15 Exhibit 18, which is three pages, each appearing
16 to be a commission due invoice on stationery of
17 Tree Spirit, the first page bearing an invoice
18 date of April 16, 2000, the second, May 9, 2000,
19 the third June 5, 2000.
20          Do you recognize these documents?
21 (Indicating.)
22     A.   Yes; I do.
23     Q.   Are they in fact those invoices that you
24 testified to?

**PERLIK and COYLE REPORTING**

```
 1        A.    Yes.
 2        Q.    You prepared these invoices?
 3        A.    Yes.
 4        Q.    What did you do with them once they were
 5   prepared?
 6        A.    I gave them to, I believe in the first
 7   case, Sue Atherton and Kathy Roberts.
 8        Q.    Who is Kathy Roberts?
 9        A.    An accounts payable clerk.
10        Q.    When you say in the first case, do you
11   mean with respect to the first invoice?
12        A.    Yes.  The second one I believe I gave it
13   to Ms. Atherton directly; and the third one I
14   believe I gave it to Ms. Atherton directly.
15        Q.    Do you know what Ms. Atherton did --
16   Ms. Atherton or in the case of the first invoice,
17   Ms. Roberts, did with these invoices?
18        A.    I know in the first two cases they were
19   entered into the accounting system of Lamson and
20   Goodnow.
21        Q.    How do you know that?
22        A.    Because there are voucher numbers
23   associated with them.
24        Q.    How do you know that?
```

1  A.   Because I have those voucher numbers.

2  Q.   How about in the case of the third

3  invoice?

4  A.   The third invoice was -- to the best of

5  my knowledge, that was not entered.

6  Q.   Do you know why?

7  A.   Because at that time Anderson and I had

8  the discussion that the amounts were due ten days

9  from them and it didn't appear that there was

10 going to be a payment that could be made based on

11 the conversations with Atherton regarding the cash

12 flow situation of Lamson and Goodnow.

13 Q.   At some point, did you inform

14 Ms. Atherton that at least this third invoice was

15 not to be booked as an account payable?

16 A.   I don't remember the specific events but

17 I believe I gave it to her and asked her to

18 initial it and to sign it and hold it and I made a

19 copy.

20 Q.   When I asked you why this third invoice

21 was not booked as an account payable, you

22 described that you and Mr. Anderson had had

23 conversations about Lamson not being able to pay

24 the commissions?

1      A.    That's correct.

2      Q.    Did that translate to some instruction

3 of Ms. Atherton not to book this as an account

4 payable?

5      A.    Yes; to hold it.

6      Q.    Do you know whether you relayed that

7 instruction to Ms. Atherton?

8      A.    I do not recall the specifics of that

9 conversation.

10     Q.    I appreciate that but do you remember if

11 you had that conversation regardless of the

12 specifics?

13     A.    I believe I participated in the

14 conversation.  I was aware of the fact that this

15 had not been entered.

16     Q.    Did that conversation involve anyone

17 other than you and Ms. Atherton?

18     A.    Anderson.

19     Q.    It was at least a three-person

20 conversation?

21     A.    I believe so; yes.

22     Q.    Was Ms. Atherton, at the same time,

23 instructed to take the accounts payable resulting

24 from the first two invoices off the books?

```
 1        A.    I believe that that happened later,
 2   towards mid June.
 3        Q.    What leads you to believe that?
 4        A.    Because Anderson and I had a
 5   conversation with regard to what we were going to
 6   do and I agreed at that time to defer the
 7   commissions pending an alternative arrangement
 8   from Anderson.
 9        Q.    Was your agreement relayed to
10   Ms. Atherton -- strike that.
11              I think you've already told me that at
12   that point -- or at some point Ms. Atherton was
13   instructed to remove them as accounts payable but
14   was not given a reason?
15        A.    That's correct.
16        Q.    Is that fair?
17        A.    I don't know what was told to her but
18   they were removed from the system.
19        Q.    By whom was she told to remove them?
20        A.    Not by me.
21        Q.    Does that mean you don't know?
22        A.    That's correct.
23        Q.    After June 5, 2000, which is the invoice
24   date on the third document in this exhibit and
```

1   A.   That is correct.
2   Q.   Do you know if the same was done with
3   respect to the value of freight expenses?
4   A.   I believe and I remember distinctly
5   knowing that these figures were separate from
6   freight because that account was handled
7   separately.
8        Freight amounts were charged to the
9   general ledger under a separate general ledger
10  account number.
11  Q.   So when the invoices say exclusive of
12  freight and net of returns, it means that the
13  value of any customer returns has been taken out
14  of the figure and the freight expense was never in
15  it, is that fair to say?
16  A.   That is correct.
17       MR. MAYNARD:  Can I have that
18  marked, please?
19            (Defendant's Deposition Exhibit
                No. 19 offered and marked.)
20
21  Q.   (BY MR. MAYNARD)  I've had marked as
22  Exhibit 19, Mr. Dunn, a three-page document.  I'll
23  let you tell me, but each page of which appears to
24  be a different version of the same document, which

```
 1   is an e-mail transmission -- appears to be an
 2   e-mail transmission from you to Mr. Anderson dated
 3   April 17, 2002? (Indicating.)
 4        A.   Yes.
 5        Q.   Do you recognize this exhibit?
 6        A.   Yes; I do.
 7        Q.   What is it?
 8        A.   This is an accounting of the Tree Spirit
 9   commissions as I calculated using Microsoft Access
10   and data from the computer systems at Lamson and
11   Goodnow to determine what the commission amounts
12   were.
13        Q.   Let me back you up.  These three pages
14   don't constitute that accounting, do they?
15        A.   The attachments to them do.
16        Q.   These three pages are the e-mail by
17   which you transmitted those attachments to
18   Mr. Anderson, right?
19        A.   That is correct.
20        Q.   Can you explain the three different
21   versions?
22        A.   Yes; just the attachments, for whatever
23   reason, did not show up on the first e-mail
24   message when it was printed out and this was the
```

1  system that was in place, April 17th, '02.  I
2  believe this is Windows 98, Outlook version from
3  Office 98.
4           The second copy then shows them as
5  attachments but doesn't show the type of file it
6  is, which is a Snapshot format file.  The third
7  document does show that.  It shows it as a
8  Snapshot file which is a photo.  Much the same as
9  Adobe Photo Shop -- excuse me, Adobe file -- it
10 cannot be altered.
11      Q.   Are these -- you'll have to --
12      A.   (Interposing) It's the same documents.
13      Q.   You'll have to pardon my ignorance but
14 are these three different versions of a screen
15 print?
16      A.   Yes -- well, excuse me.  The first one
17 is the print format that you would print it out
18 from Outlook.
19           The second one is the same but in a
20 different type font.  It's in a rich text format;
21 and the third one is a screen print.
22      Q.   Were each of these printed from the same
23 machine?
24      A.   I believe that they were.

```
 1      Q.   When I say same machine --
 2      A.   (Interposing) Except the last one.
 3      Q.   When I say the same machine, I don't
 4 mean the printer, I mean the same computer?
 5      A.   Yes; except the last one, which was
 6 printed recently from my new computer.
 7      Q.   That's your personal computer?
 8      A.   Yes; I believe this is on Windows XP so
 9 as you can see, on the bottom, it's Outlook, Tree
10 Spirit commissions, et cetera, et cetera.
11      Q.   When I look at the date on the bottom of
12 the first page and the third page, that doesn't
13 relate to the date of printing but to the date of
14 transmission?
15      A.   I believe so; I'm not positive on that
16 but it says on the date of transmission on the
17 third one on the top, sent 4/17/02 at 9:18 a.m.
18      Q.   Is it your recollection that at least
19 the first two were printed in or around April,
20 2002 as when they were went?
21      A.   I'm not sure.
22      Q.   Did you have a custom or practice of
23 printing e-mails?
24      A.   In this situation, yes.
```

**PERLIK and COYLE REPORTING**

```
 1        Q.   What do you mean, in this situation?
 2        A.   Because I wanted to record a written
 3   document that showed that I had transmitted the
 4   commission final figures to Anderson.
 5        Q.   That was important to you?
 6        A.   Yes; it was.
 7        Q.   By the way, again pardon the ignorance,
 8   but I'm assuming the signature or initials --
 9   which is it?  Is that a signature?
10        A.   That is a signature that you can embed
11   into a document.
12        Q.   It's an electronic signature that you
13   embedded in the document?
14        A.   That is correct.
15        Q.   The same is true of this photograph --
16   it's a trademark of yours, if you will, to embed
17   that or some similar photograph?
18        A.   That is correct; and that file still
19   resides on the computer at Lamson and Goodnow.
20        Q.   When you say "that file," what file are
21   you referring to?
22        A.   That signature is a file that you would
23   simply attach and embed in the document.
24        Q.   The e-mail in this case is signed by
```

```
 1     David Dunn for Tree Spirit?
 2         A.    Yes.
 3         Q.    It wasn't your normal practice to sign
 4     e-mails for Tree Spirit from Lamson and Goodnow,
 5     was it?
 6         A.    That's correct.
 7         Q.    In this case, however, the commissions,
 8     if due, were due from Lamson to Tree Spirit?
 9         A.    That's correct.
10         Q.    Which is why, then, you signed it for
11     Tree Spirit?
12         A.    That is correct.
13         Q.    Did you ever discuss with Mr. Anderson
14     the reports attached with this e-mail?
15         A.    We did not discuss it.
16         Q.    Did you ever discuss this e-mail?
17         A.    In specifics?  No.
18         Q.    How about in generalities?
19         A.    In generalities, yes, because it was
20     part of the ongoing discussion of the transaction
21     of stock for a waiver of the commissions and this
22     solidified what that amount was.
23         Q.    Did Mr. Anderson ever give you any
24     indication that he had received this e-mail?
```

```
 1      A.   Yes.
 2      Q.   What indication was that?
 3      A.   There were two indications.  One was the
 4  acknowledgment that he received the e-mail that I
 5  received back on my computer and the second
 6  acknowledgment that he had opened the e-mail.
 7      Q.   When you refer to acknowledgments,
 8  you're talking about acknowledgments created
 9  electronically by the computer system?
10      A.   That's right.
11      Q.   As opposed to an affirmative step taken
12  by Mr. Anderson personally?
13      A.   That's correct.
14      Q.   Any other indication that he had
15  received this e-mail?
16      A.   Yes; as I had said, part of the ongoing
17  conversations that this was the total amount of
18  the commissions and what the commissions would be
19  based off of and there was no disputing on that.
20      Q.   Well, did Mr. Anderson ever comment to
21  the figures attached?
22      A.   He never disputed them.
23      Q.   Thank you, I appreciate that.  Did he
24  ever comment on them?
```

1    A.    No.

2    Q.    So he never disputed them nor did he
3  ever agree with them?

4    A.    I believe if he had agreed, he would
5  have let me know.

6    Q.    Did he ever agree with them?

7    A.    Not to my knowledge.

8        MR. MAYNARD: Mr. Dunn, you produced
9  in discovery in this case a couple of documents --
10 off the record.

11       (Discussion off the record.)

12   Q.    (BY MR. MAYNARD)  I don't need to mark
13 this as an exhibit, Mr. Dunn, but I'm showing what
14 you provided as tab four to plaintiff's response
15 to defendant's first request for production of
16 documents in this matter.

17       Is that one of the attachments to the
18 e-mail we just discussed? (Indicating.)

19   A.    I believe it is.

20   Q.    Is the document following that document,
21 which also is part of tab four, the other
22 attachment?

23   A.    No.

24   Q.    Do you know what the other attachment